## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

———————————————————————

|  |  |  |
|---|---|---|
| **GINO A. DIGIALLONARDO,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **SAINT-GOBAIN RETIREMENT** | ) | **Civil Action No.** |
| **INCOME GROUP and SAINT-GOBAIN** | ) | **08-40131-FDS** |
| **CORPORATION,** | ) | |
| | ) | |
| **Defendants.** | ) | |

———————————————————————)

## MEMORANDUM AND ORDER ON
## CROSS-MOTIONS FOR SUMMARY JUDGMENT

**SAYLOR, J.**

This is a civil action arising under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.* Plaintiff Gino A. DiGiallonardo contends that defendants Saint-Gobain Retirement Income Program and Saint-Gobain Corporation unlawfully denied his application for disability retirement benefits. DiGiallonardo's application was denied after Saint-Gobain concluded that DiGiallonardo had not accumulated ten years of service prior to the onset of his disability, as required by the applicable retirement plan (the "Plan").

In Count One of his complaint, DiGiallonardo seeks both to recover the disability retirement benefits he claims were wrongfully denied, and an order declaring him eligible for future benefits. *See* 29 U.S.C. § 1132(a)(1)(B). In Count Two, DiGiallonardo asks the Court to impose administrative penalties upon Saint-Gobain for its alleged failure to make a timely

response to his written request for certain plan documents.  *See id.* § 1132(c)(1)(B).[1]  The parties

have cross-moved for summary judgment on both counts.

For the reasons provided below, the Court will remand the matter to the plan

administrator for further proceedings, and retain jurisdiction over the claim for penalties but stay

proceedings pending further developments.

## I.      Facts

### A.      Background

Gino DiGiallonardo was born in Italy in 1941 and immigrated to the United States in

1965.  (AR at 1, 18a).  On May 20, 1976, he was hired by American National Can Company as a

maintenance mechanic.  (*Id.* at 1, 21, 98).  At some point, American National merged with and

became a division of Foster-Forbes Glass Company.  (Compl. ¶ 6).  DiGiallonardo was employed

by Foster-Forbes until September 1, 1990.  (AR at 1, 188).  Sometime after 1990, Foster-Forbes

was purchased by Saint-Gobain Corporation, which succeeded to the retirement plan at issue in

this case.  (*Id.* at 297).[2]

DiGiallonardo has a long history of back problems, dating at least to 1974, two years

before he began to work at Foster-Forbes.  (*Id.* at 63, 141).  That year, Dr. H. Thomas Ballantine

performed a laminectomy on DiGiallonardo, which appeared to resolve the pain for several years.

(*Id.* at 63).  In 1981, the back pain recurred following a work injury, and he underwent a

---

[1] The Court previously dismissed Count Three, the only other count in the complaint.  (*See* Docket Entry, October 22, 2008).

[2] For the sake of clarity, the Court will refer to DiGiallonardo's employer as Foster-Forbes.  However, because DiGiallonardo applied for disability retirement benefits after Saint-Gobain purchased Foster-Forbes and began administering the retirement plan at issue in this case, the Court will refer to Saint-Gobain as the administrator.

myelogram.  (*Id.* at 41, 141).  From 1981 until 1984, he received treatment for his back pain from Dr. Ballantine.  (*Id.* at 41-52).

**B.**     **The August 9, 1984, Back Injury**

On August 9, 1984, DiGiallonardo suffered a significant back injury while at work.  (*Id.* at 57).  He had been asked to do some welding, and when he was in a "cramped" position, he felt something "give" in his back.  (*Id.*).  He immediately experienced "excruciating" pain.  (*Id.*)  He was transported by ambulance to a hospital and admitted into the emergency department.  (*Id.*).  He subsequently underwent a myelogram and, ultimately, a second laminectomy.  (*Id.* at 141).  The August 1984 injury was sufficiently debilitating that he never returned to work at Foster-Forbes.  (*Id.* at 23).  However, he remained an employee of record until September 1, 1990.  (*Id.* at 1, 188).

At the time of the August 1984 injury, DiGiallonardo's duties as a maintenance mechanic included "all type[s] of maintenance repair, building, welding, heavy lifting, using tools such as [a] drill press, torch, saws, hand tools, hydraulic jacks, [and] fork trucks."  (*Id.* at 98).  During his work day, he was almost always required to stand and only rarely required to sit or walk; he was frequently required to bend.  (*Id.*).  He routinely lifted objects weighing over fifty pounds and was sometimes obligated to lift more than one hundred pounds.  (*Id.*).

**C.**     **August 9, 1984 - September 1, 1990**

The record contains voluminous documentation of the treatment DiGiallonardo received in the years following the August 1984 back injury.  On September 17, 1984, he underwent a CT of his lower back, which revealed minimal disc bulging at the L4 and L5 vertebrae.  (*Id.* at 58).  As of November 1, the back pain continued, and he was unable to remain on his feet for any

protracted period.  (*Id.* at 61).  Dr. Ballantine opined that "[i]t seems apparent that further surgery

will be necessary if this man is to be returned to useful activity."  (*Id.*).  After some consideration,

DiGiallonardo accepted Dr. Ballantine's recommendation and opted for additional surgery.  (*See

id.* at 62).

On March 4, 1985, DiGiallonardo was admitted to Massachusetts General Hospital—his

fifth admission to MGH for treatment of his back pain.  (*Id.* at 63).  He underwent a L5 lumbar

laminectomy on March 6 to treat a herniated disc and to excise a ruptured disc.  (*Id.*).  He was

discharged eight days later.  (*Id.* at 63-64).

On April 18, 1985, DiGiallonardo was reevaluated by Dr. Ballantine, who noted that he

"ha[d] continued to improve" since the March surgery.  (*Id.* at 66).  His leg pain had completely

disappeared, and he walked well on both his heels and toes, although his back bending was

markedly restricted.  (*Id.*).  Dr. Ballantine opined:

> I believe that this man can return to useful activity if his activities are restricted to
> a point where he is not required to do a great deal of back bending and that heavy
> lifting can be confined to not more than 30 pounds.  On several occasions, I have
> recommended such a regimen for this man and have urged Foster-Forbes to carry
> out a program of rehabilitation for him.  To date, I have had no response to these
> suggestions.  I believe that this patient is well motivated and if properly handled at
> the work-place can become a useful citizen.

(*Id.*).  One month later, however, DiGiallonardo's symptoms had returned.  (*Id.* at 67).  At a May

1985 visit with Dr. Ballantine, he reported that his symptoms had increased.  (*Id.*).  During a June

appointment, he "complain[ed] bitterly of low back pain . . . . He [] also complain[ed] of pain in

the intrascapular region and radiating pain in the left sacroiliac region which radiated to the left

testicle."  (*Id.* at 68).  Dr. Ballantine opined:  "It seems apparent we have reached a plateau in

treating this individual."  (*Id.*).

By August 20, 1985, DiGiallonardo had seen "no change in his symptoms.  He was still having a great deal of pain in the low back and the left lower extremity."  (*Id.* at 69).  Dr. Ballantine concluded:  "This man remains totally disabled for his previous occupation and it is beginning to appear as though this disability will be permanent."  (*Id.*).

By the summer of 1986, DiGiallonardo had regressed without a clear explanation.  (*Id.* at 72).  On July 22, he underwent a CT scan of his lumbar spine and a lumbar myelogram.  (*Id.* at 73-74).  The tests revealed mild disc bulges at the L3-4 and L4-5 levels, "narrowing and vacuum disc phenomenon at L5-S1 with increased soft tissue displacing left S1 nerve root posteriorly[,] which could represent focal disc herniation or scarring," as well as "underfilling of the right S1 nerve root."  (*Id.*).

In consultation with Dr. Robert Boyd, DiGiallonardo was again evaluated by Dr. Ballantine on July 30.  (*Id.* at 76).  In a letter to Foster-Forbes, the doctors concluded that DiGiallonardo "could carry out about 80% of his regular duties.  [They] did not feel that he should have to crawl into closed spaces (such as under a conveyer belt), that he should not be asked to lift more than 30 pounds and should not have to go up and down ladders."  (*Id.*).  They also opined that "it would be most helpful to the patient if he could have three or four breaks during the working day when he could lie flat."  (*Id.*).  Despite this evaluation, Foster-Forbes did not have an available position that could accommodate these restrictions, and DiGiallonardo did not return to work.  (*Id.* at 66; *see id.* at 81).

In connection with his pursuit of workers' compensation benefits, which he had been receiving since his August 1984 injury, DiGiallonardo was evaluated by Dr. Joseph A. Dorgan on

February 3, 1988.  (*Id.* at 80-81).  Dr. Dorgan agreed with Dr. Ballantine's conclusion that DiGiallonardo was disabled from his previous duties at Foster-Forbes, but that he was capable of performing lighter type work if such a position were available.  (*Id.* at 81).  He stated: "I believe [DiGiallonardo] could be rehabilitated to a lighter type of work which he has been seeking." (*Id.*).

Based on Dr. Dorgan's report, on March 15, 1988, Foster-Forbes—which had continued to employ DiGiallonardo even though he had not returned to work—sought to discontinue his worker's compensation benefits.  (*Id.* at 85-89).  DiGiallonardo contested the discontinuance and underwent a number of additional evaluations.  (*See id.* at 135-36, 176-77).  These evaluations generally reiterated the conclusions of DiGiallonardo's prior consultations:  he was disabled from performing the full range of duties he was responsible for prior to his August 1984 injury, but was capable of performing light duty work.  (*Id.* at 136, 177).  Ultimately, during the fall of 1990, DiGiallonardo and Foster-Forbes entered into a lump-sum settlement of the worker's compensation claim.  (*Id.* at 191-92).

On September 1, 1990, near the time of the worker's compensation settlement, DiGiallonardo's employment with Foster-Forbes came to an end.  (*Id.* at 191).  In a letter dated October 17, 1990, Foster-Forbes gave him the following summary of the status of his benefits:

> [Y]ou are vesting your pension rights under the union shop contract with Foster[-]Forbes effective September 1, 1990. . . .
>
> Also, as provided for in the pension article of the union shop contract, you have vested pension rights for 14.28 years of service at the rate of $19.00 per month, per year of service, beginning with the month after you attain 65 years of age.  This benefit is based on your combined employment period of May 20, 1976[,] through[] September, 1, 1990.

6

(*Id.* at 188).   In the six-plus years between his back injury and his separation from Foster-Forbes,

DiGiallonardo had never returned to work.  (*Id.* at 23).

### D.        Application for Social Security Disability Benefits

On April 14, 1988, while he was still employed by Foster-Forbes and receiving worker's

compensation benefits, DiGiallonardo applied for Social Security disability benefits.  (*Id.* at 93).

In connection with his application, DiGiallonardo was evaluated by Dr. Benjamin Matzilevich on

April 25, 1988.  (*Id.* at 102-04).  Dr. Matzilevich echoed the conclusions of the prior evaluations,

finding that DiGiallonardo had "a history of chronic low back pain, left leg pain with findings of

radiculopathy, especially of L4 through S1."  (*Id.* at 104).  Dr. Matzilevich opined that

DiGiallonardo "was incapacitated for return to his usual employment as a maintenance mechanic.

However, light duties which do not require prolonged sitting, driving, carrying or lifting may be

fulfilled by his present condition."  (*Id.*).  Dr. Matzilevich concluded that "[n]o significant

improvement is to be expected in the future.  Condition is deemed permanent."  (*Id.*).

The Social Security Administration initially denied DiGiallonardo's disability benefits claim

on May 20, 1988.  (*Id.* at 105-06).  The SSA acknowledged that DiGiallonardo was "unable to

perform certain types of jobs because of [his] medical condition."  (*Id.* at 106).  But the SSA

"determined that [his] condition does not keep [him] from working [entirely]," because "[t]he

medical evidence indicates that [he] would be capable of light work."  (*Id.*).

 DiGiallonardo moved to reconsider the denial on June 14, 1988.  (*Id.* at 107-10).  He

asserted that since his initial application for disability benefits, he was suffering from increased

swelling and pain on the bottom of both feet.  (*Id.* at 107).  He also indicated that he would

occasionally need his wife's help getting dressed and undressed, and that on those occasions when

his pain was particularly bad, he would not be able to climb stairs and would have to sleep downstairs. (*Id.* at 108). After review, the SSA denied his request for reconsideration on October 14, 1988. (*Id.* at 116-17). According to the SSA, "We have concluded that your condition would restrict you to sedentary work. Although you may be unable to perform your past work, there are other types of less strenuous sedentary jobs that you should be able to do." (*Id.* at 117).

DiGiallonardo then requested a hearing before an administrative law judge. (*See id.* at 138). That hearing occurred on April 25, 1989. (*Id.*). DiGiallonardo, who was represented by counsel, testified. (*Id.* at 149-43).

In a written decision issued on April 28, 1989, the ALJ overturned the previous decisions and found that, as of August 9, 1984, DiGiallonardo was "disabled" within the meaning of the Social Security Act. (*Id.* at 142). The ALJ concluded that DiGiallonardo suffered from a severe impairment and, in the alternative, that the effects of his pain and other symptoms were such that he could not perform a full range of sedentary work. (*Id.*). The ALJ's opinion stated the following:

> The claimant's testimony at the hearing was entirely consistent with the medical signs and findings of record and with the conclusions of treating and examining physicians, including the independent consultant examining physician. His testimony shows that he is very significantly limited in regard to his activities of daily living; he requires assistance in caring for his own personal needs and is unable to perform any household chores. The impression which he made at the hearing has been carefully considered; his testimony is found to be wholly credible and worthy of belief, especially in light of his return to work after prior surgeries.

(*Id.* at 142).

DiGiallonardo began receiving disability benefits in June 1990, retroactive to April 1987,

twelve months prior to the date he filed his application.  (*Id.* at 146, 148).

**E.      Application for Disability Retirement Benefits**

On January 24, 2006, some sixteen years later, DiGiallonardo contacted Saint-Gobain

concerning his entitlement to retirement benefits.  (*Id.* at 211; Compl. ¶ 17).[3]  DiGiallonardo's

inquiry was prompted by the fact that his sixty-fifth birthday was approaching, which the October

17, 1990, letter from Foster-Forbes indicated was the date on which payments would begin.  (AR

at 188).  Saint-Gobain—which had purchased Foster-Forbes sometime after DiGiallonardo's

employment ended—responded that it did not have enough information to make a retirement

benefits determination.  (*Id.* at 213).[4]  It requested that DiGiallonardo obtain and forward a

document entitled "Detailed Earnings Information" from the SSA in order to aid its investigation.

(*Id.*).  DiGiallonardo complied with that request.  On May 1, 2006, Saint-Gobain sent

DiGiallonardo a letter stating that he was not eligible for retirement benefits, notwithstanding the

Foster-Forbes letter of October 17, 1990.  (*Id.* at 223).  Saint-Gobain suggested that he contact

the American National Can Company directly to see if he was eligible for pension benefits through

its plan.  (*Id.*).

DiGiallonardo contacted American National, which told him that Saint-Gobain was the

entity responsible for administering the applicable retirement plan because it had purchased

Foster-Forbes and succeeded to its obligations.  (*See id.* at 228, 244).  DiGiallonardo again wrote

---

[3] There are two types of benefits relevant to this case.  The first, "retirement benefits," refer to those that DiGiallonardo currently receives as a result of his 14.2877 years of service at Foster-Forbes (from May 20, 1976, through September 1, 1990).  The second, "disability retirement benefits," are those that DiGiallonardo presently seeks.

[4] At some point, there had been a fire and many (if not all) of plaintiff's employment files apparently had been destroyed.

9

to Saint-Gobain to inquire about his eligibility for retirement benefits and, over the course of the next few months, provided it with a number of documents to support his request. (*See id.* at 228, 230-41). Ultimately, on March 16, 2007, Saint-Gobain wrote to DiGiallonardo and informed him that he was entitled to retirement benefits as of May 1, 2006, the first full month after he turned 65. (*Id.* at 267).[5] DiGiallonardo was entitled to retirement benefits based upon 14.2877 years of service with Foster-Forbes—May 20, 1976, through September 1, 1990. (*Id.* at 270). Saint-Gobain's letter included the paperwork necessary for DiGiallonardo to begin receiving benefits. (*Id.* at 267-85).

On March 31, 2006, DiGiallonardo replied to the March 16 letter, noting that "there are many references to the plan documents and information [but that] the packet of information [Saint-Gobain] sent d[id] not include any plan information." (*Id.* at 15). He requested "copies of[] all plan information and documents so [he could] get a better understanding of the documents" Saint-Gobain had already provided. (*Id.*). Saint-Gobain responded on April 20, 2007, providing DiGiallonardo with a summary plan description of the 2004 plan. (*Id.* at 243-65).

On May 24, 2007, after reviewing the documents, DiGiallonardo wrote to Saint-Gobain and made a claim for disability retirement benefits in addition to the general retirement benefits to which he was concededly entitled. (*Id.* at 16). DiGiallonardo supported his claim with a voluminous binder of information and documents. (*See, e.g.*, *id.* at 16-39). DiGiallonardo's claim included a written request for "[a]ny and all copies of documents governing the operation of the Plan, including insurance contracts . . . ." (*Id.* at 37).

---

[5] The Foster-Forbes Glass Company Service Retirement Plan had merged with the Saint-Gobain Corporation Retirement Plan when Saint-Gobain purchased Foster-Forbes in the early 1990's.

On July 30, 2007, Saint-Gobain wrote to DiGiallonardo denying his claim for disability retirement benefits. (*Id.* at 296-300). The letter stated that because DiGiallonardo's employment had terminated on September 1, 1990, the 1988 version of the retirement plan—which was in effect at the time of his termination—governed the request, as did the Union Shop Contract to which he was subject. (*Id.* at 296). Both documents were attached to the letter. (*See id.* at 302-03). The letter further stated that DiGiallonardo was not entitled to disability retirement benefits because he had not accumulated ten years of service prior to the onset of his disability. (*Id.* at 297). Under the Plan, a disability is defined as:

> 1.13 <u>DISABILITY</u>:  A total mental or physical disability resulting from injury or disease, the definition and proof of which shall be determined under the provisions of the group life insurance contract maintained by the [Foster-Forbes Company] for Employees who are AFGWU[6] Members and GMP[7] Members, occurring after competition of at least 10 Years of Service.

(*Id.* at 424; *see id.* at 297). The Union Shop Contract similarly provided:

> If an employee who had ten (10) or more years of credited service becomes permanently disabled on or after April 1, 1980, he may be retired on a monthly disability income figure as if he were age 65 on the date of such disability ane such date shall be determined as the last day the employee worked because of such disability. . . .

(*Id.* at 304; *see id.* at 297). Interpreting these provision, Saint-Gobain concluded that DiGiallonardo was not eligible for disability retirement benefits because the date of onset of his disability was August 9, 1984. (*Id.* at 297). As of that date, he had accumulated only 8.33 years of service. (*Id.*).

On September 14, 2007, DiGiallonardo appealed the adverse decision to the Saint-Gobain

---

[6] The American Flint Glass Workers' Union of North America.  (AR at 422).

[7] The Glass, Molders, Pottery, Plastics and Allied Workers International Union.  (AR at 431).

Benefits Committee, arguing that he should be given credit for years of service up to September 1, 1990, the day his employment with Foster-Forbes terminated. (*Id.* at 352). The Benefits Committee affirmed the denial on December 12, 2007. (*Id.* at 415-18). It rejected DiGiallonardo's contention that he should be credited with years of service up to his termination in 1990, noting that the Plan unequivocally provided that years of service were to be calculated as of the onset of the disability. (*Id.* at 416). Relying particularly on the ALJ's decision and the fact that DiGiallonardo did not return to work following his back injury on August 9, 1984, the Committee concluded that DiGiallonardo became disabled as of that date. (*Id.* at 417). This evidence, according to the Committee, proved dispositive in light of the "inconsistent, equivocal and inconclusive" medical evaluations upon which DiGiallonardo relied. (*Id.*). Because DiGiallonardo had only accumulated 8.33 years of service as of August 9, 1984, he was not entitled to disability retirement benefits. (*Id.*).

Saint-Gobain has represented to the Court that, at the time it denied DiGiallonardo's claim, it did not have a copy of the group life insurance contract on which the Plan relies for its definition of disability. (Defs.' Reply Mem. at 5; *see* AR at 424 (defining disability as "[a] total mental or physical disability resulting from injury or disease, *the definition and proof of which shall be determined under the provisions of the group life insurance contract maintained by the [Foster-Forbes Company] for Employees who are AFGWU Members and GMP Members . . .*" (emphasis added))). Instead, Saint-Gobain asserts that its denial was based on the Social Security Act's definition of "disability," although neither the initial denial letter of July 30, 2007, nor the decision of the Benefits Committee expressly adopt that definition. (Defs.' Reply Mem. at 5)

### F.     This Lawsuit

DiGiallonardo filed a complaint in this Court on July 7, 2008, challenging Saint-Gobain's denial of disability retirement benefits.  Because the Court previously dismissed Count Three on the complaint, only two counts remain.  In Count One, DiGiallonardo alleges that Saint-Gobain acted arbitrarily and capriciously in denying his claim for disability retirement benefits, in violation of 29 U.S.C. § 1132(a)(1)(B).  In Count Two, he contends that Saint-Gobain failed to respond to his written request for certain plan documents for more than one year, in violation of 29 U.S.C. § 1132(c)(1)(B).  The parties have cross-moved for summary judgment on both counts.

## II.    Standard of Review

### A.     Denial of Benefits

"In an ERISA benefit denial case . . . the district court sits more as an appellate tribunal than as a trial court.  It does not take evidence, but, rather, evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary."  *Leahy v. Raytheon Co.*, 315 F.3d 11, 17-18 (1st Cir. 2002).  That determination is reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.  *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).  When the plan administrator has been granted such discretion, its decision must be upheld unless "arbitrary, capricious or an abuse of discretion." *Diaz v. Seafarer's Int'l Union*, 13 F.3d 454, 456 (1st Cir. 1994).  In this case, the parties agree that the plan grants the administrator discretion to determine eligibility and, therefore, that defendants' decision denial of plaintiff's application is subject to arbitrary and capricious review. (*Compare* Defs.' Mem. at 2-4, *with* Pl.'s Mem. at 8).

Under this standard, the Court must decide "whether the aggregate evidence . . . could support a rational determination that the plan administrator acted arbitrarily in denying the claim for benefits." *Wright v. R.R. Donnelley & Sons Co. Group Benefits Plan*, 402 F.3d 67, 74 (1st Cir. 2005) (quotation omitted). The Court will uphold the administrator's decision if it was "reasoned and supported by substantial evidence." *Gannon v. Metro. Life Ins. Co.*, 360 F.3d 211, 213 (1st Cir.2004). "Evidence is substantial when it is reasonably sufficient to support a conclusion." *Wright*, 402 F.3d at 74 (quotation omitted). "Evidence contrary to an administrator's decision does not make the decision unreasonable, provided substantial evidence supports the decision." *Id.* Because the Court sits essentially as an appellate tribunal, "the factual determination of eligibility for benefits is decided solely on the administrative record, and 'the non-moving party is not entitled to the usual inferences in its favor.'" *Bard v. Boston Shipping Ass'n*, 471 F.3d 229, 235 (1st Cir. 2006) (quoting *Orndorf v. Paul Revere Life Ins. Co.*, 404 F.3d 510, 517 (1st Cir. 2005)).

### B.     Failure to Respond to Written Request

ERISA requires an administrator to provide an employee with specified information upon written request. 29 U.S.C. § 1024(b)(4). An administrator that fails to comply with such a request within thirty days is subject to administrative penalties, unless that failure is the result of matters reasonably beyond the administrator's control. 29 U.S.C. § 1132(c)(1)(B). The decision to impose administrative penalties is committed to the sound discretion of the court. *Id; see Rodriguez-Abreu v. Chase Manhattan Bank, N.A.*, 986 F.2d 580, 588 (1st Cir. 1993) ("The imposition of penalties is committed, by statute, to the discretion of the trial court, and we will not overturn the court's determination absent an abuse of discretion."). Prejudice to the

employee is not a prerequisite.  *Rodriguez-Abreu*, 986 F.2d at 588.

**III.**     **Analysis**

    **A.**     **The Denial of Disability Benefits**

Count One of the complaint alleges that defendants improperly denied plaintiff's claim for disability retirement benefits.  First, plaintiff argues that defendants acted arbitrarily by "invent[ing] a hybrid definition of 'disability' that favored the denial of benefits when there were at least three different definitions which were addressed by the medical experts in their opinions." (Pl. Mem. at 9).  Second, assuming the Social Security Act's definition of "disability" is the correct one, plaintiff contends that defendants lacked substantial evidence to conclude that he was disabled as of August 9, 1984.  (Pl. Mem. at 12-14).  Plaintiff admits that the Plan conditions eligibility for benefits on the accumulation of ten years of service prior to the onset of the disability, but he argues that he became disabled no earlier than November 27, 1988, and therefore satisfies that requirement.  (*Id.* at 10, 14).  Finally, plaintiff asserts that defendants acted inconsistently by crediting him with 14.2877 years of service toward the calculation of his retirement benefits, while crediting him with only 8.33 years of service in determining his eligibility for disability retirement benefits.  (*Id.* at 14-15).

In response, defendants concede that the administrative record does not contain a copy of the group life insurance contract which, as all parties agree, provides the operative definition of "disability."  (Defs.' Reply Mem. at 5).  Even so, defendants contend that their use of the Social Security Act definition was proper.  (*Id.*).  The Social Security standard is a particularly exacting one, defendants contend, and its use therefore inured to plaintiff's benefit because his interest is in showing that he became disabled at sometime *after* ten years of service.  (*Id.*).  Second,

defendants argue that substantial evidence supports the denial of benefits, particularly because the SSA itself concluded that plaintiff was disabled as of August 9, 1984, before plaintiff had accumulated ten years of service.  (*Id.* at 6-11).  Finally, defendants contend that plaintiff's 14.2877 *total* years of service at Foster-Forbes is irrelevant because eligibility for disability retirement benefits turns of years of service *prior to* disability onset.  (*Id.* at 12; Defs.' Reply Mem. at 6-8).

### 1.    The Definition of "Disability"

There is no dispute that plaintiff is eligible for disability retirement benefits only if he accumulated ten years of service prior to becoming disabled.  The case therefore centers on the Plan's definition of "disability."  As noted, the Plan provides:

> 1.13 <u>DISABILITY</u>:  A total mental or physical disability resulting from injury or disease, the definition and proof of which shall be determined under the provisions of the group life insurance contract maintained by the Company for Employees who are AFGWU Members and GMP Members, occurring after competition of at least 10 Years of Service.

(AR at 424).  Neither party disputes that the "group life insurance contract" referred to in the Plan is not in the record, or that the administrator did not consider that contract when making its decision.  The question is whether that fact necessitates a remand.  On the facts of this case, the answer is "yes."

An administrator's decision to deny benefits must be "reasoned."  *Buffonge v. Prudential Ins. Co.*, 426 F.3d 20, 30 (1st Cir. 2005).  Furthermore, the administrator must "provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, *setting forth the specific reasons for such denial*."  29 U.S.C. § 1133(1) (emphasis added).  An aggrieved claimant is entitled to a full and fair review of the administrator's decision.

*Id.* §§ 1132(a), 1133(2).

Here, defendants did not refer to or rely upon the operative definition of "disability" as contained in the Plan—that is, the definition of disability in "the group life insurance contract maintained by the Company for Employees who are AFGWU Members and GMP Members." (AR at 296-300, 415-18, 424). Under the circumstances, the denial of plaintiff's claim was arbitrary and capricious.

As noted, neither the group life insurance contract nor the definition set forth in that contract is part of the record. The Court cannot tell whether the definition is missing due to negligence (*e.g.*, no one thought to include it), for good cause (*e.g.*, the relevant documents have been destroyed through no fault of the parties), or for some other reason. Regardless, defendants in denying the claim did not explain the absence of the definition from the record or justify their use of another definition. (*See id.*). While Saint-Gobain now asserts that it utilized the SSA's definition of "disability" because it was the most plaintiff-friendly standard, this is "merely [a] 'post hoc' rationalization[], which ha[s] traditionally been found to be an inadequate basis for review." *See Citizens to Preserve Overton Park, Inc., v. Volpe*, 401 U.S. 402, 419 (1971) (quotation omitted), *abrogated on other grounds by*, *Califano v. Sanders*, 430 U.S. 99, 105 (1977).

In short, the Court has no way of knowing how the Plan defines "disability," or whether the administrator's decision to use a different definition was reasonable. This in turn precludes the Court from providing the meaningful appellate review to which the plaintiff is entitled. *See Bernstein v. CapitalCare, Inc.*, 70 F.3d 783, 789 (4th Cir. 1995) ("If the district court is to conduct meaningful appellate review of a benefit determination, even under a deferential standard,

the administrative record must document the decision-making process.").

      2.    **Remedy**

      Having concluded that defendants acted arbitrarily and capriciously in denying plaintiff's claim, the Court must decide what remedy to impose. "Once a court finds that an administrator has acted arbitrarily and capriciously in denying a claim for benefits, the court can either remand the case to the administrator for a renewed evaluation of the claimant's case, or it can award a retroactive reinstatement of benefits." *Cook v. Liberty Life Assurance Co.*, 320 F.3d 11, 24 (1st Cir. 2003). The latter course, however, is generally appropriate only when the evidence compels the conclusion that the claimant was improperly denied benefits to which he was otherwise entitled. *Buffonge*, 426 F.3d at 31; *see Elliott v. Metropolitan Life Ins. Co.*, 473 F.3d 613, 621-22 (6th Cir. 2006). Here, the evidence is far from clear, and indeed seems to suggest that the claimant is not so entitled. In any event, without knowing how the Plan defines "disability," there is simply no way to decide whether plaintiff is entitled to disability retirement benefits. As a result, remand to the administrator for further proceedings is the proper remedy. *Buffonge*, 426 F.3d at 31; *Cook*, 320 F.3d at 23-24.

      On remand, defendants should evaluate plaintiff's disability claim under the "provisions of the group life insurance contract maintained by the Company for Employees who are AFGWU Members and GMP Members" as required by Section 1.13 of the Plan. (AR at 424). Defendants do not appear to contend that the group life insurance contract is lost or unrecoverable, only that they did not have a copy at the time they denied plaintiff's claim. (Defs.' Reply Mem. at 5). The Court therefore expresses no opinion as to what definition of "disability" ought to govern should defendants be unable to locate a copy of the applicable contract notwithstanding a good faith

18

effort. That decision, at least in the first instance, is for the administrator.[8]

### B.    Failure to Respond to Written Request

Count Two of the complaint alleges that defendants acted unlawfully in failing to respond

in a timely manner to his written request for certain plan documents.   Under ERISA,

> The administrator shall, upon written request of any participant or beneficiary,
> furnish a copy of the latest updated summary, plan description, and the latest
> annual report, any terminal report, the bargaining agreement, trust agreement,
> contract, or other instruments under which the plan is established or operated.

29 U.S.C. § 1024(b)(4).  A administrator's failure to comply with § 1024(b)(4) may be subject it

to administrative penalties:

> Any administrator . . . who fails or refuses to comply with a request for any
> information which such administrator is required by this subchapter to furnish to a
> participant or beneficiary (unless such failure or refusal results from matters
> reasonably beyond the control of the administrator) by mailing the material
> requested to the last known address of the requesting participant or beneficiary
> within 30 days after such request may in the court's discretion be personally liable
> to such participant or beneficiary in the amount of up to $100 a day from the date
> of such failure or refusal, and the court may in its discretion order such other relief
> as it deems proper.

29 U.S.C. § 1132(c)(1)(B).

Plaintiff first contends that he made a written request for plan documents on January 24,

2006, and that defendants did not respond until April 20, 2007, nearly fifteen months later.  (Pl.

Mem. at 15-16; Compl. ¶¶ 17, 21, 34; *see* AR at 211).  But the record does not support plaintiff's

contention.  The January 24, 2006, writing to which plaintiff refers is not a written request from

him *to* defendants for Plan documents; rather, it is his response to a request *from* defendants for

---

[8] Given the Court's decision to remand the case, it need not consider whether substantial evidence
supports the defendants' decision under the Social Security Act's definition of "disability," or whether defendants
acted inconsistently by crediting plaintiff with 8.33 years of service in determining his eligibility for disability
retirement benefits while awarding 14.2877 years of service toward the calculation of his retirement benefits.

information to facilitate his claim for retirement benefits.  (AR at 211).  That defendants did not provide information in response is hardly surprising.  By contrast, on March 31, 2007, plaintiff did submit a written request for Plan information and documents.  (*Id.* at 15 (requesting "copies of[] all plan information and documents")).  But as plaintiff concedes, defendants replied to that request on April 20, 2007, within the required thirty days.  (*Id.* at 243-65).

Plaintiff's second argument is more compelling.  Included in his May 27, 2007, application for disability retirement benefits was a written request for, among other things, "[a]ny and all copies of documents governing the operation of the Plan, *including insurance contracts . . . .*" (*Id.* at 37 (emphasis added)).  As discussed above, the Plan incorporates the definition of disability contained in "the group life insurance contract maintained by the Company for Employees who are AFGWU Members and GMP Members."  (*Id.* at 424).  It is uncontested that, to date, defendants have not provided a copy of this contract to plaintiff.  Although prejudice is not a prerequisite for the imposition of administrative penalties, *Rodriguez-Abreu*, 986 F.2d at 588, plaintiff may very well have been prejudiced by defendants' failure to produce the contract.  Not only was his claim for disability retirement benefits denied, but he no doubt incurred considerable costs litigating this case in federal court.

On the present record, however, it would be premature to award penalties to plaintiff, because the Court cannot ascertain whether defendants' failure to produce a copy of the relevant contract was "reasonably beyond the control of the administrator."  29 U.S.C. § 1132(c)(1)(B).  Accordingly, while the Court will grant summary judgment to the plaintiff on Count One and remand the case to the administrator for further proceedings, it will deny plaintiff's motion for summary judgment on Count Two without prejudice to its renewal should defendants fail to

produce a copy of the insurance contract.  The Court will retain jurisdiction over the case but stay proceedings pending the resolution of plaintiff's claim on remand.  Should circumstances warrant, plaintiff may move to vacate the stay and renew his claim for administrative penalties.  For the present, the Court expresses no opinion as to the merits of such a request.

**IV.   <u>Conclusion</u>**

For the foregoing reasons, Defendants' Motion for Summary Judgment is DENIED as to both Counts One and Two.  Plaintiff's Motion for Summary Judgment is GRANTED as to Count One insofar as the case is remanded to the administrator for further proceedings and DENIED without prejudice to its renewal as to Count Two.

Further proceedings before the Court are hereby stayed pending the resolution of plaintiff's claim on remand.  The stay will expire, and the case will be dismissed, one year from the entry of this memorandum and order unless the plaintiff moves in this Court to seek appropriate relief prior to that date.

**So Ordered.**

                                        /s/ F. Dennis Saylor
                                        F. Dennis Saylor IV
                                        United States District Judge

Dated: February 9, 2010